**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA :

    **v.**                   **:**       **1:19-cr-00413 (TJK)**

CARL COURTNEY         **:**

### DEFENDANT'S SUPPLEMENT TO JOINT EMERGENCY MOTION FOR IMMEDIATE RELEASE

      Given the global pandemic caused by COVID-19 and concern about Mr. Courtney's unique medical situation, counsel for Mr. Courtney and the United States jointly move for Mr. Courtney's immediate release.  Mr. Courtney supplements this Motion with the attached exhibits that support the necessity of Mr. Courtney's immediate release.

                        Respectfully submitted,

                        A. J. KRAMER
                        FEDERAL PUBLIC DEFENDER

                          /s/
                      _____
                        EUGENE OHM
                        Assistant Federal Public Defender
                        625 Indiana Avenue, N.W., Suite 550
                        Washington, D.C.  20004
                        (202) 208-7500

# EXHIBIT A

March 19, 2020

**RE:**      **COVID-19 Risks for Detained Populations in Maryland
from a group of concerned scientists, physicians, and
public health experts**

To the Honorable Judges of the Maryland District and Circuit Courts, state and local
corrections departments:

We write as a group of concerned physicians and public health experts strongly
urging the Maryland court system to address the ongoing global health pandemic by
swiftly implementing the following recommendations:

1) **Immediately implement community-based alternatives to
detention to alleviate potential exposure to COVID-19 in jails and
prisons; and**

2) **Incarcerate as few people as possible in order to mitigate the harm
from a COVID-19 outbreak. Detained populations are at high risk
to contract a virus like COVID-19 which spreads through
respiratory droplets.**

I.      <u>**Coronavirus Pandemic**</u>

In light of the rapid global outbreak of the novel coronavirus disease 2019
(COVID-19), we want to bring attention to the serious harms facing individuals in
detention facilities in Maryland. The United States Department of Health and Human
Services Secretary Alex Azar declared a public health emergency on January 31, 2020,
and Governor Larry Hogan declared a public health emergency in Maryland on March
5, 2020. The state of Maryland has since closed all schools, restaurants and other
places of public gathering. The courts have halted regular judicial activity with the
exception of emergency matters.

As of March 18, 2020, there have been over 210,000 confirmed cases worldwide with over 8,900 deaths. The US has over 7,500 confirmed cases with 117 deaths. Maryland has 85 confirmed cases and one death. **Public health experts expect the number of confirmed cases to rise exponentially and warn that the situation in the U.S. will get worse before improving.**

## II.   Public Health Conditions in Detention Facilities Already Poor

Detention facilities are designed to maximize control of the incarcerated population, not to minimize disease transmission or to efficiently deliver health care. For these reasons, transmission of infectious diseases in jails and prisons is incredibly common, especially those transmitted by respiratory droplets. It is estimated that up to a quarter of the US prison population has been infected with tuberculosis[1], with a rate of active TB infection that is 6-10 times higher than the general population.[2] **Flu outbreaks are regular occurrences in jails and prisons across the United States.[3],[4] With a mortality rate 10 times greater than the seasonal flu and a higher R0 (the average number of individuals who can contract the disease from a single infected person)[5] than Ebola, an outbreak of COVID-19 in detention facilities would be devastating.**

## III.   Risks of a COVID-19 Outbreak in Detention

Emerging evidence about COVID-19 indicates that spread is mostly via respiratory droplets among close contacts[6] and through contact with contaminated surfaces or objects. Reports that the virus may be viable for hours in the air and on surfaces are particularly concerning.[7] Though people are most contagious when they are symptomatic, transmission has been documented in the absence of symptoms. We have reached the point where community spread is occurring in the U.S. The number of cases is growing exponentially, and health systems are already being strained.

**Social distancing measures recommended by the Centers for Disease Control (CDC)[8] are nearly impossible in detention facilities and testing remains largely unavailable**. In facilities that are already at maximum capacity large-scale quarantines may not be feasible. Isolation may be misused and place individuals at higher risk of neglect and death. COVID-19 threatens the well-being of detained

individuals, as well as the corrections staff who shuttle between the community and detention facilities.

Given these facts, it is only a matter of time before we become aware of COVID-19 cases in a detention setting in which inmates live in close quarters, with subpar infection control measures in place, and whose population represents some of the most vulnerable. **In this setting, we can expect spread of COVID-19 in a manner similar to that at the Life Care Center of Kirkland, Washington, at which over 50% of residents have tested positive for the virus and over 20% have died in the past month.** Such an outbreak would further strain the community's health care system.

**In about 16% of cases of COVID-19, illness is severe including pneumonia with respiratory failure, septic shock, multi-organ failure, and even death.** Some people are at higher risk of getting severely sick from this illness. This includes people who have serious chronic medical conditions like asthma, lung disease, diabetes, and those who are immunocompromised. There are currently no antiviral drugs licensed by the U.S. Food and Drug Administration (FDA) to treat COVID-19, or post-exposure prophylaxis to prevent infection once exposed.

## IV.    <u>Maryland Jails are No Exception</u>

Like many states, Maryland has moved into the community transmission phase of this pandemic, and has seen a spike in cases in just over a few days. As courts continue to hear bond hearings and other emergency matters, it is critical that the population of detained people be reduced as much as possible and that extra steps are taken to protect those who are or will remain incarcerated.

Public defenders report that in one jurisdiction, people are brought to bond review hearings in shackles, chained together in close proximity. In other jurisdictions, detained people are crammed into small spaces as they await their bond hearings. Jails and courts should immediately put an end to these practices. Public defenders have also reported that judges are detaining some people on cash bonds that they cannot afford even in cases where there is no public safety threat. Where there is no public safety threat, courts must prioritize public health, and release low-income people

without financial conditions. In addition, in some facilities across the state, detained people must pay a fee to make medical calls—this, in addition to limiting access to soap and hand sanitizer, are practices that jeopardize the individual and collective health of those in jail, including staff. While we are encouraged to hear that some jails are working with the prosecutor and public defender offices to identify vulnerable populations, including the elderly and those with pre-existing conditions, we urge all jurisdictions to take these steps and act swiftly.

This public health crisis requires each and every one of us to re-evaluate how we conduct our lives and care for one and other. Institutions responsible for the care and custody of incarcerated individuals must take unique steps to "flatten the curve" and slow the spread of this virus. We strongly recommend that the courts implement community-based alternatives to detention to alleviate potential exposure in jails. Incarcerating as few people as possible will help mitigate the harm from a COVID-19 outbreak.

Sincerely,

Maryland State Medical Society

Richard Bruno, MD, MPH
Board Certified, Family Medicine
Board Certified, Preventive Medicine
Chair, Public Health Committee, MedChi (Maryland State Medical Society)

Chris Beyrer, MD, MPH
Professor of Medicine, Division of Infectious Diseases,
Johns Hopkins School of Medicine
Johns Hopkins Bloomberg School of Public Health

Andrea Wirtz, PhD, MHS
Assistant Scientist of Epidemiology
Johns Hopkins Bloomberg School of Public Health

Ju Nyeong Park, PhD, MHS
Assistant Scientist
Johns Hopkins Bloomberg School of Public Health

Emily Wang, MD, MA
Assistant Professor of Internal Medicine
Yale School of Medicine

Tracy Rabin, MD, SM
Assistant Professor of Internal Medicine
Yale School of Medicine

Leonard Rubenstein, JD, LLM
Senior Scientist
Johns Hopkins Bloomberg School of Public Health

Gabriel B. Eber, JD, MPH
Senior Associate
Johns Hopkins Bloomberg School of Public Health

Jonathan Giftos, MD, AAHIVS
Medical Director, Addiction Medicine & Drug User Health
Project Renewal, Inc.

Theodore Cohen, MD, MPH, DPH.
Professor of Epidemiology
Yale School of Public Health, Department of Epidemiology of Microbial Diseases

Lee W. Riley, MD
Professor and Head, Division of Infectious Disease and Vaccinology
University of California Berkeley, School of Public Health

Albert Ko, MD
Professor of Epidemiology, Infectious Disease; and Professor of Public Health
Yale Medical School and Yale School of Public Health

Gregg Gonsalves, PhD
Assistant Professor of Epidemiology of Microbial Diseases
Yale University School of Medicine and the Graduate School

Benjamin A. Howell, MD, MPH, MHS
National Clinician Scholars Program Fellow
Yale School of Medicine and Health Justice Lab

Gerald Friedland, MD

Professor Emeritus of Medicine, Epidemiology and Public Health and Senior
Research Scientist
Yale School of Medicine and Public Health

Carrie Redlich, MD, MPH
Professor, Department of Medicine
Yale School of Medicine

Eva Raphael, MD, MPH
Clinical Research Fellow
University of California, San Francisco

[1] Hammett TM, Harmon MP, Rhodes W. The burden of infectious disease among inmates of and releases from US
correctional facilities, 1997, *Am J Public Health*, 2002, vol. 92 (pg. 1789-94)

[2] Centers for Disease Control Prevention (CDC). Prevention and control of tuberculosis in correctional and detention
facilities: recommendations from CDC, *MMWR Morb Mortal Wkly Rep*, 2006, vol. 55 (pg. 1-48)

[3] Dober, G. Influenza Season Hits Nation's Prisons and Jails. *Prison Legal News*, June, 2018 (pg. 36)
https://www.prisonlegalnews.org/news/2018/jun/5/influenza-season-hits-nations-prisons-and-jails/

[4] Pandemic influenza and jail facilities and populations, Laura Maruschak, et. al., American Journal of Public Health,
September 2009

[5] The R0 is the reproduction number, defined as the expected number of cases directly generated by one case in a
population where all individuals are susceptible to infection.

[6] Close contact is defined as—

a) being within approximately 6 feet (2 meters) of a COVID-19 case for a prolonged period of time; close contact can
occur while caring for, living with, visiting, or sharing a health care waiting area or room with a COVID-19 case

b) having direct contact with infectious secretions of a COVID-19 case (e.g., being coughed on)

[7]   https://www.medrxiv.org/content/10.1101/2020.03.09.20033217v1.full.pdf

[8] https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/plan-prepare-respond.html

# EXHIBIT B

Declaration for Persons in Detention and Detention Staff
COVID-19

Chris Beyrer, MD, MPH
Professor of Epidemiology
Johns Hopkins Bloomberg School of Public Health
Baltimore, MD

I, Chris Beyrer, declare as follows:

1. I am a professor of Epidemiology, International Health, and Medicine at the Johns Hopkins Bloomberg School of Public Health, where I regularly teach courses in the epidemiology of infectious diseases. This coming semester, I am teaching a course on emerging infections. I am a member of the National Academy of Medicine, a former President of the International AIDS Society, and a past winner of the Lowell E. Bellin Award for Excellence in Preventive Medicine and Community Health.  I have been active in infectious diseases Epidemiology since completing my training in Preventive Medicine and Public Health at Johns Hopkins in 1992.

2. I am currently actively at work on the COVID-19 pandemic in the United States. Among other activities I am the Director of the Center for Public Health and Human Rights at Johns Hopkins, which is active in disease prevention and health promotion among vulnerable populations, including prisoners and detainees, in the US, Africa, Asia, and Latin America.

### The nature of COVID-19

3. The SARS-nCoV-2 virus, and the human infection it causes, COVID-19 disease, is a global pandemic and has been termed a global health emergency by the WHO. Cases first began appearing sometime between December 1, 2019 and December 31, 2019 in Hubei Province, China. Most of these cases were associated with a wet seafood market in Wuhan City.

4. On January 7, 2020, the virus was isolated. The virus was analyzed and discovered to be a coronavirus closely related to the SARS coronavirus which caused the 2002-2003 SARS epidemic.

5. COVID-19 is a serious disease. The overall case fatality rate has been estimated to range from 0.3 to 3.5%, which is 5-35 times the fatality associated with influenza infection. COVID-19 is characterized by a flu-like illness. While more than 80% of cases are self-limited and generally mild, overall some 20% of cases will have more severe disease requiring medical intervention and support.

6. The case fatality rate varies significantly depending on the presence of certain demographic and health factors. The case fatality rate is higher in men, and varies significantly with advancing age, rising after age 50, and above 5% (1 in 20 cases) for those with pre-existing medical conditions including cardio-vascular disease, respiratory disease, diabetes, and immune compromise.

7. Among patients who have more serious disease, some 30% will progress to Acute Respiratory Distress Syndrome (ARDS) which has a 30% mortality rate overall, higher in those with other health conditions.  Some 13% of these patients will require mechanical

ventilation, which is why intensive care beds and ventilators have been in insufficient supply in Italy, Iran, and parts of China.

8. COVID-19 is widespread. Since it first appeared in Hubei Province, China, in late 2019, outbreaks have subsequently occurred in more than 100 countries and all continents, heavily affected countries include Italy, Spain, Iran, South Korea, and increasingly, the US.  As of today, March 16th, 2020, there have been 178,508 confirmed human cases globally, 7,055 known deaths, and some 78,000 persons have recovered from the infection.  The pandemic has been termed a global health emergency by the WHO. It is not contained and cases are growing exponentially.

9. SARS-nCoV-2 is now known to be fully adapted to human to human spread.  This is almost certainly a new human infection, which also means that there is no pre-existing or "herd" immunity, allowing for very rapid chains of transmission once the virus is circulating in communities.

10. The U.S. CDC estimates that the reproduction rate of the virus, the $R_0$, is 2.4-3.8, meaning that each newly infected person is estimated to infect on average 3 additional persons. This is highly infectious and only the great influenza pandemic of 1918 (the Spanish Flu as it was then known) is thought to have higher infectivity.  This again, is likely a function of all human populations currently being highly susceptible.  The attack rate given an exposure is also high, estimated at 20-30% depending on community conditions, but may be as high as 80% in some settings and populations.  The incubation period is thought to be 2-14 days, which is why isolation is generally limited to 14 days.

### The risks of COVID-19 in detention facilities

11. COVID-19 poses a serious risk to inmates and workers in detention facilities. Detention Facilities, including jails, prisons, and other closed settings, have long been known to be associated with high transmission probabilities for infectious diseases, including tuberculosis, multi-drug resistant tuberculosis, MRSA (methicillin resistant staph aureus), and viral hepatitis.

12. The severe epidemic of Tuberculosis in prisons in Central Asia and Eastern Europe was demonstrated to increase community rates of Tuberculosis in multiple states in that region, underscoring the risks prison outbreaks can lead to for the communities from which inmates derive.

13. Infections that are transmitted through droplets, like influenza and SARS-nCoV-2 virus, are particularly difficult to control in detention facilities, as 6-foot distancing and proper decontamination of surfaces is virtually impossible. For example, several deaths were reported in the US in immigration detention facilities associated with ARDS following influenza A, including a 16-year old male immigrant child who died of untreated ARDS in custody in May, 2019.

14. A number of features of these facilities can heighten risks for exposure, acquisition, transmission, and clinical complications of these infectious diseases. These include physical/mechanical risks such as overcrowding, population density in close confinement, insufficient ventilation, shared toilet, shower, and eating environments and limits on hygiene and personal protective equipment such as masks and gloves in some facilities.

15. Additionally, the high rate of turnover and population mixing of staff and detainees increases likelihoods of exposure.  This has led to prison outbreaks of COVID-19 in multiple detention facilities in China, associated with introduction into facilities by staff.

16. In addition to the nature of the prison environment, prison and jail populations are also at additional risk, due to high rates of chronic health conditions, substance use, mental health issues, and, particularly in prisons, aging and chronically ill populations who may be vulnerable to more severe illnesses after infection, and to death.

17. While every effort should be made to reduce exposure in detention facilities, this may be extremely difficult to achieve and sustain.  It is therefore an urgent priority in this time of national public health emergency to reduce the number of persons in detention as quickly as possible.

18. Pre-trial detention should be considered only in genuine cases of security concerns. Persons held for non-payment of fees and fines, or because of insufficient funds to pay bail, should be prioritized for release.  Immigrants awaiting decisions on their removal cases who are not a flight risk can be monitored in the community and should be released from immigration detention centers. Older inmates and those with chronic conditions predisposing to severe COVID-19 disease (heart disease, lung disease, diabetes, immune-compromise) should be considered for release.

19. Given the experience in China as well as the literature on infectious diseases in jail, an outbreak of COVID-19 among the U.S. jail and prison population is likely. Releasing as many inmates as possible is important to protect the health of inmates, the health of correctional facility staff, the health of health care workers at jails and other detention facilities, and the health of the community as a whole.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of March, 2020.


_____
Professor Chris Beyrer[1]

---

[1] These views are mine alone; I do not speak for Johns Hopkins University or any department therein.

**References**

Stuckler D,  Basu S, McKee M, King I.  Mass incarceration can explain population increases in
TB and multi-drug resistant TB in European and Central Asian countries.  Proceedings of the
National Academy of Science USA, 2008. 105:13280-85.

Beyrer C, Kamarulzaman A, McKee M; Lancet HIV in Prisoners Group. Prisoners,
     prisons, and HIV: time for reform.  *The Lancet.* 2016 Jul 14. pii: S0140-
     6736(16)30829-7. doi: 10.1016/S0140-6736(16)30829-7. [Epub ahead of print] No
     abstract available.
     PMID: 27427447.

Marusshak LM, Sabol W, Potter R, Reid L, Cramer E.   Pandemic Influenza and Jail
     Facilities and Populations.  American Journal of Public Health.  2009 October;
     99(Suppl 2): S339–S344.

Rubenstein LS, Amon JJ, McLemore M, Eba P, Dolan K, Lines R, Beyrer C. HIV,
     prisoners, and human rights.  *The Lancet.* 2016 Jul 14. pii: S0140-6736(16)30663-
     8. doi: 10.1016/S0140-6736(16)30663-8

Wang J, Ng, CY, Brook R.  Response to COVID-19 in Taiwan:  Big Data Analytics, New
     Technology, and Proactive Testing. March 3, 2020.  *JAMA.* Published online
     March 3, 2020. doi:10.1001/jama.2020.3151

# EXHIBIT C

Declaration of Robert B. Greifinger, MD

I, Robert B. Greifinger, declare as follows:

1. I am a physician who has worked in health care for prisoners for more than 30 years.  I have managed the medical care for inmates in the custody of New York City (Rikers Island) and the New York State prison system.  I have authored more than 80 scholarly publications, many of which are about public health and communicable disease.  I am the editor of *Public Health Behind Bars: from Prisons to Communities,* a book published by Springer (a second edition is due to be published in early 2021); and co-author of a scholarly paper on outbreak control in correctional facilities.[1]

2. I have been an independent consultant on prison and jail health care since 1995.  My clients have included the U.S. Department of Justice, Division of Civil Rights (for 23 years) and the U.S. Department of Homeland Security, Section for Civil Rights and Civil Liberties (for six years). I am familiar with immigration detention centers, having toured and evaluated the medical care in approximately 20 immigration detention centers, out of the several hundred correctional facilities I have visited during my career.  I currently monitor the medical care in three large county jails for Federal Courts.  My resume is attached as Exhibit A.

3. COVID-19 is a coronavirus disease that has reached pandemic status. As of today, according to the World Health Organization, more than 132,000 people have been diagnosed with COVID-19 around the world and 4,947 have died.[2] In the United States, about 1,700 people have been diagnosed and 41 people have died thus far.[3] These numbers are likely an underestimate, due to the lack of availability of testing.

4. COVID-19 is a serious disease, ranging from no symptoms or mild ones for people at low risk, to respiratory failure and death in older patients and patients with chronic underlying conditions. There is no vaccine to prevent COVID-19. There is no known cure or anti-viral treatment for COVID-19 at this time. The only way to mitigate COVID-19 is to use scrupulous hand hygiene and social distancing.

5. People in the high-risk category for COVID-19, i.e., the elderly or those with underlying disease, are likely to suffer serious illness and death. According to preliminary data from China, 20% of people in high risk categories who contract COVID-19 have died.

---

[1] Parvez FM, Lobato MN, Greifinger RB. Tuberculosis Control: Lessons for Outbreak Preparedness in Correctional Facilities. Journal of Correctional Health Care OnlineFirst, published on May 12, 2010 as doi:10.1177/1078345810367593.

[2] See https://experience.arcgis.com/experience/685d0ace521648f8a5beeeee1b9125cd, accessed March 13, 2020.

[3] See https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html?searchResultPosition=1, accessed March 13, 2020.

6. Those who do not die have prolonged serious illness, for the most part requiring expensive hospital care, including ventilators that will likely be in very short supply.

7. The Centers for Disease Control and Prevention (CDC) has identified underlying medical conditions that may increase the risk of serious COVID-19 for individuals of any age: blood disorders, chronic kidney or liver disease, compromised immune system, endocrine disorders, including diabetes, metabolic disorders, heart and lung disease, neurological and neurologic and neurodevelopmental conditions, and current or recent pregnancy.

8. Social distancing and hand hygiene are the only known ways to prevent the rapid spread of COVID-19. For that reason, public health officials have recommended extraordinary measures to combat the spread of COVID-19. Schools, courts, collegiate and professional sports, theater and other congregate settings have been closed as part of risk mitigation strategy.  At least one nursing home in the Seattle area has had cases of COVID-19 and has been quarantined.

9. The Seattle metropolitan area, hit hard by COVID, is the epicenter of the largest national outbreak at this time. Therefore, it is highly likely, and perhaps inevitable, that COVID-19 will reach the immigration detention facility in Tacoma, Washington. Immigration courts and the ICE field office in Seattle have already closed this month due to staff exposure to COVID-19.

10. The conditions of immigration detention facilities pose a heightened public health risk to the spread of COVID-19, even greater than other non-carceral institutions.

11. Immigration detention facilities are enclosed environments, much like the cruise ships that were the site of the largest concentrated outbreaks of COVID-19. Immigration detention facilities have even greater risk of infectious spread because of conditions of crowding, the proportion of vulnerable people detained, and often scant medical care resources. People live in close quarters and cannot achieve the "social distancing" needed to effectively prevent the spread of COVID-19. Toilets, sinks, and showers are shared, without disinfection between use. Food preparation and food service is communal, with little opportunity for surface disinfection.  Staff arrive and leave on a shift basis; there is little to no ability to adequately screen staff for new, asymptomatic infection.

12. Many immigration detention facilities lack adequate medical care infrastructure to address the spread of infectious disease and treatment of high-risk people in detention. As examples, immigration detention facilities often use practical nurses who practice beyond the scope of their licenses; have part-time physicians who have limited availability to be on-site; and facilities with no formal linkages with local health departments or hospitals.

13. The only viable public health strategy available is risk mitigation. Even with the best-laid plans to address the spread of COVID-19 in detention facilities, the release of high-risk individuals is a key part of a risk mitigation strategy. In my opinion, the public health recommendation is to release high-risk people from detention, given the heightened risks

to their health and safety, especially given the lack of a viable vaccine for prevention or effective treatment at this stage.

14. To the extent that vulnerable detainees have had exposure to known cases with laboratory-confirmed infection with the virus that causes COVID-19, they should be tested immediately in concert with the local health department.  Those who test negative should be released.

15. This release cohort can be separated into two groups.  Group 1 could be released to home quarantine for 14 days, assuming they can be picked up from NWDC by their families or sponsors.  Group 2 comprises those who cannot be easily transported to their homes by their families or sponsors.  Group 2 could be released to a housing venue for 14 days, determined in concert with the Pierce County or Washington State Department of Health.


Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this _14th_ day in March, 2020 in New York City, New York.


Robert B. Greifinger, M.D.

# EXHIBIT D

**Declaration of Dr. Marc Stern**

I, Marc Stern, declare as follows:

1.      I am a physician, board-specialized in internal medicine, specializing in correctional health care. I most recently served as the Assistant Secretary for Health Care at the Washington State Department of Corrections. I also have considerable familiarity with the immigration detention system. I served for four years as a medical subject matter expert for the Officer of Civil Rights and Civil Liberties, U.S. Department of Homeland Security, and as a medical subject matter expert for one year for the California Attorney General's division responsible for monitoring the conditions of confinement in Immigration and Customs Enforcement (ICE) detention facilities. I have also served as a consultant to Human Rights Watch in their preparation of two reports on health-related conditions of confinement in ICE detention facilities. In those capacities, I have visited and examined more than 20 ICE detention facilities and reviewed hundreds of records, including medical records and detention death reviews of individuals in ICE detention. Attached as Exhibit A is a copy of my curriculum vitae.

2.      COVID-19 is a serious disease and has reached pandemic status. At least 132,758 people around the world have received confirmed diagnoses of COVID 19 as of March 13, 2020, including 1,629 people in the United States. At least 4,955 people have died globally as a result of COVID-19 as of March 13, 2020, including 41 in the United States. These numbers will increase, perhaps exponentially.

3.      COVID-19 is a novel virus. There is no vaccine for COVID-19, and there is no cure for COVID-19. No one has immunity. The only way to control the virus is to use preventive strategies, including social distancing.

4.      The time course of the disease can be very rapid. Individuals can show the first symptoms of infection in as little as two days after exposure and their condition can seriously deteriorate in as little as five days (perhaps sooner) after that.

5.      The effects of COVID-19 are very serious, especially for people who are most vulnerable. Vulnerable people include people over the age of 50, and those of any age with underlying health problems such as – but not limited to – weakened immune systems, hypertension, diabetes, blood, lung, kidney, heart, and liver disease, and possibly pregnancy.

6.      Vulnerable people who are infected by the COVID-19 virus can experience severe respiratory illness, as well as damage to other major organs. Treatment for serious cases of COVID-19 requires significant advanced support, including ventilator assistance for respiration and intensive care support. An outbreak of COVID-19 could put significant pressure on or exceed the capacity of local health infrastructure.

7.      Detention facilities are congregate environments, i.e. places where people live and sleep in close proximity. In such environments, infectious diseases that are transmitted via the air or touch are more likely to spread. This therefore presents an increased danger for the spread of COVID-

19 if and when it is introduced into the facility. To the extent that detainees are housed in close quarters, unable to maintain a six-foot distance from others, and sharing or touching objects used by others, the risks of spread are greatly, if not exponentially, increased as already evidenced by spread of COVID-19 in another congregate environment: nursing homes and cruise ships.

8.     Social distancing in ways that are recommended by public health officials can be difficult, if not impossible in detention facilities, placing people at risk, especially when the number of detainees is high.

9.     For detainees who are at high risk of serious illness or death should they contract the COVID-19 virus, release from detention is a critically important way to meaningfully mitigate that risk. Additionally, the release of detainees who present a low risk of harm to the community is also an important mitigation strategy as it reduces the total number of detainees in a facility. Combined, this has a number of valuable effects on public health and public safety: it allows for greater social distancing, which reduces the chance of spread if virus is introduced; it allows easier provision of preventive measures such as soap for handwashing, cleaning supplies for surfaces, frequent laundering and showers, etc.; and it helps prevent overloading the work of detention staff such that they can continue to ensure the safety of detainees.

10.     The release of detainees, especially those with increased health-related vulnerability, also supports the broader community because carceral and detention settings, regardless of the level of government authorities that oversee them, are integral parts of the community's public health infrastructure.  Reducing the spread and severity of infection in a Federal immigration detention center slows, if not reduces, the number of people who will become ill enough to require hospitalization, which in turn reduces the health and economic burden to the local community at large.

11.     As a correctional public health expert, I recommend release of eligible individuals from detention, with priority given to the elderly and those with underlying medical conditions most vulnerable to serious illness or death if infected with COVID-19.

12.     Conditions related to COVID-19 are changing rapidly and may change between the time I execute this Declaration and when this matter appears before the Court. One of the most worrisome changes would be confirmation of a case of COVID-19 within the detention center, either among staff or detainees. In the event of this occurring, and eligible detainees being quarantined or isolated due to possible exposure to the virus, I recommend that the detainee(s) be tested for the virus if testing is available. Armed with the results of that test if it is available, or in the absence of other instructions from the health authority of the municipality to which they will be returning or the Washington State public health authority, those who can easily return to a home without exposure to the public, should be released to that home for continued quarantine or isolation for the appropriate time period. All others can be released to appropriate housing as directed or arranged in coordination with the relevant health authority.

13.     I have reviewed Plaintiffs' complaint and on the basis of the claims presented, conclude that Plaintiffs have underlying medical conditions that increase the risk of serious illness or death if exposed to COVID-19. Due to the risks caused by the congregate environment in immigration

detention, compounded by the marked increase in risk conferred by their underlying medical conditions, I recommend their release.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this __15th___ day in March, 2020 in Tumwater, Washington.

_____

Dr. Marc Stern

# EXHIBIT E

## DECLARATION OF DR. JONATHAN LOUIS GOLOB

I, Jonathan Louis Golob, declare as follows:

1. I am an Assistant Professor at the University of Michigan School of Medicine in Ann Arbor, Michigan, where I am a specialist in infectious diseases and internal medicine. At the University of Michigan School of Medicine, I am a practicing physician and a laboratory-based scientist. My primary subspecialization is for infections in immunocompromised patients, and my recent scientific publications focus on how microbes affect immunocompromised people.  I obtained my medical degree and completed my residency at the University of Washington School of Medicine in Seattle, Washington, and also completed a Fellowship in Internal Medicine Infectious Disease at the University of Washington. I am actively involved in the planning and care for patients with COVID-19. Attached as Exhibit A is a copy of my curriculum vitae.

2. COVID-19 is a novel zoonotic coronavirus that has been identified as the cause of a viral outbreak that originated in Wuhan, China in December 2019. The World Health Organization has declared that COVID-19 is causing a pandemic. As of March 12, 2020, there are over 140,000 confirmed cases of COVID-19. COVID-19 has caused over 5,000 deaths, with exponentially growing outbreaks occurring at multiple sites worldwide, including within the United States.

3. COVID-19 makes certain populations of people severely ill. People over the age of fifty are at higher risk, with those over 70 at serious risk. As the Center for Disease Control and Prevention has advised, certain medical conditions increase the risk of serious COVID-19 for people of any age. These medical conditions include: those with lung disease, heart disease, diabetes, or immunocompromised (such as from cancer, HIV, autoimmune diseases), blood disorders (including sickle cell disease), chronic liver or kidney disease, inherited metabolic disorders, stroke, developmental delay, or pregnancy.

4. For all people, even in advanced countries with very effective health care systems such as the Republic of Korea, the case fatality rate of this infection is about ten fold higher than that observed from a severe seasonal influenza. In the more vulnerable groups, both the need for care, including intensive care, and death is much higher than we observe from influenza infection: In the highest risk populations, the case fatality rate is about 15%. For high risk patients who do not die from COVID-19, a prolonged recovery is expected to be required, including the need for extensive rehabilitation for profound deconditioning, loss of digits, neurologic damage, and loss of respiratory capacity that can be expected from such a severe illness.

5.  In most people, the virus causes fever, cough, and shortness of breath. In high-risk individuals as noted above, this shortness of breath can often be severe. Even in younger and healthier people, infection of this virus requires supportive care, which includes supplemental oxygen, positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation.

6.  Most people in the higher risk categories will require more advanced support: positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation. Such care requires highly specialized equipment in limited supply as well as an entire team of care providers, including but not limited to 1:1 or 1:2 nurse to patient ratios, respiratory therapists and intensive care physicians. This level of support can quickly exceed local health care resources.

7.  The COVID-19 virus can severely damage the lung tissue, requiring an extensive period of rehabilitation and in some cases a permanent loss of respiratory capacity.  The virus also seems to target the heart muscle itself, causing a medical condition called myocarditis, or inflammation of the heart muscle. Myocarditis can affect the heart muscle and electrical system, which reduces the heart's ability to pump, leading to rapid or abnormal heart rhythms in the short term, and heart failure that limits exercise tolerance and the ability to work lifelong. There is emerging evidence that the virus can trigger an over-response by the immune system in infected people, further damaging tissues. This cytokine release syndrome can result in widespread damage to other organs, including permanent injury to the kidneys (leading to dialysis dependence) and neurologic injury.

8.  There is no vaccine for this infection. Unlike influenza, there is no known effective antiviral medication to prevent or treat infection from COVID-19. Experimental therapies are being attempted. The only known effective measures to reduce the risk for a vulnerable person from injury or death from COVID-19 are to prevent individuals from being infected with the COVID-19 virus. Social distancing, or remaining physically separated from known or potentially infected individuals, and hygiene, including washing with soap and water, are the only known effective measures for protecting vulnerable communities from COVID-19.

9.  COVID-19 is known to be spreading in the Seattle, Washington-area community. As of March 11, 2020 there are 270 confirmed cases of COVID-19 (an increase of 36 from March 10, 2020) and twenty-seven deaths from COVID-19 in the Seattle area. This

represents the largest known outbreak in the United States, and one the largest known outbreaks in the world as of March 12, 2020.

10. Nationally, without effective public health interventions, CDC projections indicate about 200 million people in the United States could be infected over the course of the epidemic, with as many as 1.5 million deaths in the most severe projections. Effective public health measures, including social distancing and hygiene for vulnerable populations, could reduce these numbers.

11. Based on the recovered genomes of the virus from the community analyzed by the Nextstrain project run by Dr. Trevor Bedford of the Fred Hutchinson Cancer Research Center in Seattle, it is known that the infection is being shared from person to person in and around Seattle. COVID-19 strains have specifically traced infection between residents and staff members of a skilled nursing facility in the Seattle area. This evidence suggests that COVID-19 is capable of spreading rapidly in institutionalized settings. The highest known person-to-person transmission rates for COVID-19 are in a skilled nursing facility in Kirkland, Washington and on afflicted cruise ships in Japan and off the coast of California. The strain of virus spreading in the Seattle area is genetically related to the strain of virus that spread readily on the cruise ships.

12. The COVID-19 outbreak in Seattle has resulted in the need for unprecedented public health measures, including multiple efforts to facilitate and enforce social distancing. These include encouraging employees to work from home, bans of gathering of more than 250 people, closure of schools, closure of the University of Washington campus in Seattle, limitations of visitation to skilled nursing facilities, and cancellation of major public events. Individuals have been asked to delay or cancel health care procedures in order to free up capacity within the system.

13. During the H1N1 influenza ("Swine Flu") epidemic in 2009, jails and prisons were sites of severe outbreaks of viral infection. Given the avid spread of COVID-19 in skilled nursing facilities and cruise ships, it is reasonable to expect COVID-19 will also readily spread in detention centers, particularly when residents cannot engage in proper hygiene and isolate themselves from infected residents or staff.

14. This information provides many reasons to conclude that vulnerable people, people over the age of 50 and people of any age with lung disease, heart disease, diabetes, or immunocompromised (such as from cancer, HIV, autoimmune diseases), blood disorders (including sickle cell disease), chronic liver or kidney disease, inherited metabolic disorders, stroke, developmental delay, or pregnancy living in an institutional setting,

such as an immigration detention center, with limited access to adequate hygiene facilities and exposure to potentially infected individuals from the community are at grave risk of severe illness and death from COVID-19.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this __13th__ day in March, 2020 in Ann Arbor, Michigan.

Dr. Jonathan Louis Golob

# EXHIBIT F

**Skip to main content**

METRO

# Top Rikers doctor: Coronavirus 'storm is coming'

By Craig McCarthy and Natalie Musumeci                                    March 19, 2020 | 11:29am



REUTERS

▌ Sign up for our special edition newsletter to get a daily update on the coronavirus pandemic.

The head doctor at Rikers Island has warned that a "storm is coming" as the coronavirus will inevitably spread through the city's vast jail complex unless precautions are taken.

Ross MacDonald, the chief medical officer for Correctional Health Services, posted the message in a series of tweets late Wednesday as he called for the release of inmates amid the COVID-19 pandemic.

"A message from the Chief Physician of Rikers Island for the judges and prosecutors of New York: We who care for those you detain noticed how swiftly you closed your courts in response to #COVID19," MacDonald's tweet thread began.

"This was fundamentally an act of social distancing, a sound strategy in public health. But the luxury that allows you to protect yourselves, carries with it an obligation to those you detain," MacDonald wrote in another tweet.

MacDonald added that inmates must not be left in "harm's way."

"To be clear, the public servants who care for those in your jails have been planning for this
storm for weeks and months. We will muster every tool of public health, science and medicine

to try to keep our patients safe. We will apply every novel treatment and scarce test," the doctor wrote.

MacDonald then touched on how social distancing is not practical in a jail setting.

Dr. Ross MacDonald

_____

Dr. Ross MacDonald
NYC Health

"We will put ourselves at personal risk and ask little in return. But we cannot change the fundamental nature of jail. We cannot socially distance dozens of elderly men living in a dorm, sharing a bathroom. Think of a cruise ship recklessly boarding more passengers each day," he tweeted.

In another tweet, MacDonald warned: "A storm is coming and I know what I'll be doing when it claims my first patient. What will you be doing? What will you have done? We have told you who is at risk. Please let as many out as you possibly can."

MacDonald posted his message hours after Mayor Bill de Blasio said that he plans to release "vulnerable" inmates from city jails in order to prevent the spread of coronavirus into local lockups.

"In the next 48 hours, we will identify any inmates who need to be brought out because of either their own health conditions — if they have any pre-existing conditions, etc. — or because the charges were minor and we think it's appropriate to bring them out in this context," the mayor said Wednesday evening.

The announcement came after both a correction officer and an inmate tested positive for the deadly virus in the past day.

FILED UNDER    **CORONAVIRUS**, **CORONAVIRUS IN NY**, **DOCTORS**, **JAIL**, **RIKERS ISLAND**

|